T.C. Memo. 2010-65

UNITED STATES TAX COURT

WILLIAM R. KLAUER, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 18181-07, 15147-08,    Filed April 5, 2010.
         15148-08, 15149-08,
         15150-08, 15151-08,
         15152-08, 15153-08.

<u>Gary J. Streit</u>, for petitioners.

<u>Steven W. LaBounty</u>, for respondent.

---

[1]Cases of the following petitioners are consolidated here-
with:  Justin E. Klauer, docket No. 15147-08; William M. and
Dionne T. Klauer, docket No. 15148-08; James D. and Kathleen A.
Klauer, docket No. 15149-08; Michael R. and Kristen A. Igo,
docket No. 15150-08; Robert E. and Judy A. Klauer, docket No.
15151-08; James F. and Nancy A. Klauer, docket No. 15152-08; and
Michael J. and Emily Klauer, docket No. 15153-08.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined deficiencies in petitioners' Federal income tax (tax) as follows:

| Petitioner(s) | 2001 | 2002 | 2003 |
|---|---|---|---|
| William R. Klauer | $158,079 | $175,237 | $58,609 |
| Justin E. Klauer | 4,134 | 2,377 | ([1]) |
| William M. and Dionne T. Klauer | 14,162 | 8,638 | 2,745 |
| James D. and Kathleen A. Klauer | 16,683 | 8,293 | 11,238 |
| Michael R. and Kristen A. Igo[2] | 17,795 | 10,979 | 1,989 |
| Robert E. and Judy A. Klauer | 160,436 | 210,915 | 59,480 |
| James F. and Nancy A. Klauer[3] | 213,325 | 88,971 | 85,910 |
| Michael J. and Emily Klauer[4] | 12,971 | 7,908 | 5,755 |

[1]During 2003, petitioner Justin E. Klauer was a stockholder of Klauer Manufacturing Co.  The record does not contain a tax return that he filed for his taxable year 2003.  Nor does the record contain a notice of deficiency (notice) issued to him for that taxable year raising the issue that we address herein.

[2]Respondent sent to petitioners Michael R. and Kristen A. Igo a separate notice for their taxable year 2004 in which respondent determined a deficiency of $4,353 for that year.  That determination is based, inter alia, on the disallowance of a certain credit carried over to that year.  Resolution of that credit carryover issue flows from our resolution of the issue that we address herein.

[3]Respondent sent to petitioners James F. and Nancy A. Klauer a separate notice for their taxable year 2004 in which respondent determined a deficiency of $30,808 for that year.  That determination is based, inter alia, on the disallowance of a certain credit carried over to that year.  Resolution of that credit carryover issue flows from our resolution of the issue that we address herein.

[4]The parties stipulated that petitioner Michael J. Klauer's first name is "William".  That stipulation is clearly contrary to the facts that we have found are established by the record, and we shall disregard it.  See <u>Cal-Maine Foods, Inc. v. Commissioner</u>, 93 T.C. 181, 195 (1989).  The record establishes, and we have found, that respondent sent a notice to petitioner Michael J. Klauer, who was not married in 2001, for his taxable year

2001.  The record further establishes, and we have found, that respondent sent a separate notice addressed to both petitioners Michael J. and Emily Klauer, who were married in 2002 and 2003, for each of their taxable years 2002 and 2003.

The only issue that we must decide is whether Klauer Manufacturing Co. is entitled for each of its taxable years 2001, 2002, and 2003 to a charitable contribution deduction under section 170(a)[2] with respect to the transfer of certain real property.[3]  We hold that it is.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found except as stated herein.

At the time petitioners William R. Klauer, Justin E. Klauer, William M. and Dionne T. Klauer, Michael R. and Kristen A. Igo, Robert E. and Judy A. Klauer, and James F. and Nancy A. Klauer filed their respective petitions, they resided in Iowa.  At the time petitioners James D. and Kathleen A. Klauer filed their petition, they resided in Massachusetts.  At the time petitioners

---

[2]All section references are to the Internal Revenue Code (Code) in effect for the years at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

[3]As discussed below, for each of its taxable years 2001, 2002, and 2003 Klauer Manufacturing Co. (Klauer Manufacturing or Company) was an S corporation.  As a result, any charitable contribution deduction that it claimed for each of those years flowed through to its stockholders, certain petitioners herein (stockholder petitioners).

Michael J. and Emily Klauer filed their petition, they resided in Nebraska.

At all relevant times, petitioners James D. Klauer, James F. Klauer, Judy A. Klauer, Justin E. Klauer, Michael J. Klauer, Nancy A. Klauer, Robert E. Klauer, William M. Klauer, William R. Klauer, and Kristen A. Igo were stockholders of Klauer Manufacturing.[4]

In 1870, Peter Klauer organized Klauer Manufacturing in Iowa as a hardware and tin shop. At all relevant times, members of Peter Klauer's family (Klauer family) owned the Company, an S corporation that maintained its principal place of business in Iowa. At those times, Klauer Manufacturing manufactured and sold a variety of sheet metal building products, including steel and aluminum gutters, panels, and roofing materials.

In 1919, Klauer Manufacturing began acquiring land in New Mexico. By 2001, the Company owned approximately 9,800 acres of vacant land in Taos County, south of the Town of Taos, New Mexico (Taos). William J. Klauer, who died in February 2001, was the Klauer family member most directly involved with the land that

---

[4]Petitioners Dionne T. Klauer, Kathleen A. Klauer, Michael R. Igo, and Emily Klauer are petitioners in their respective cases solely because each filed a joint tax return with his or her spouse, who was a stockholder of Klauer Manufacturing during the years at issue.

Klauer Manufacturing owned in Taos, which he visited on a regular basis.

Included in the 9,800 acres of land that the Company owned in Taos were approximately 2,581 acres known as the Taos Valley Overlook (Taos Overlook), from which one can view the Rio Grande Gorge and the Rio Grande River.[5]  At all relevant times, Klauer Manufacturing paid the real estate taxes on and the costs of maintaining the acres of the Taos Overlook that it owned.  The Klauer family felt strongly that the Taos Overlook should be preserved from commercial development.

Before 2001, Klauer Manufacturing leased for $1 annually approximately 700 acres of the Taos Overlook to the U.S. Department of the Interior Bureau of Land Management (Bureau of Land Management), which owned property adjacent to the Taos Overlook. The Bureau of Land Management used and managed those leased acres as part of an area known as the Orilla Verde Recreation Area.

At various times, the Bureau of Land Management discussed with Klauer Manufacturing its interest in acquiring the 700 acres of the Taos Overlook that it was leasing.  Those discussions included a proposal for the exchange of certain respective prop-

---

[5]At all relevant times, New Mexico State Highway 68 bordered the southern edge of the Taos Overlook, from which one can view the Rio Grande Gorge.

erties that the Bureau of Land Management and the Company owned. However, the Bureau of Land Management and the Company were not able to reach an agreement.

Around August 1999, representatives of the Trust for Public Land (Trust), which was organized in 1972 and which was at all relevant times an organization described in sections 501(c)(3) and 170(c)(2), approached representatives of the Company, including William J. Klauer, to discuss the Trust's interest in the Taos Overlook. The Trust's interest was consistent with its mission to protect open space from development, create parks and provide recreational opportunities, safeguard water supplies, protect wildlife, and conserve important natural resources. In order to accomplish that mission, at all relevant times the Trust searched for land that was of interest to certain public agencies, such as the Bureau of Land Management, acquired certain of those properties, and conveyed the acquired properties to those agencies. In other words, at all relevant times the Trust acted as a third-party facilitator for the acquisition of certain properties of interest to certain public agencies and conveyed those acquired properties to those agencies. In initiating discussions with Klauer Manufacturing in the summer of 1999, the Trust contemplated conveying to the Bureau of Land Management any portion

of the Taos Overlook that it was able to acquire from the Company.[6]

At all relevant times, the Trust supported its operations through appropriations of funds (appropriations) that the U.S. Congress (Congress) made and, to a lesser extent, through philanthropic donations. At those times, the Trust prepared and maintained a list of various projects for the acquisition of certain land of interest to certain public agencies. It sought funding for those acquisitions by, inter alia, lobbying members of Congress for appropriations and requesting philanthropic donors to provide funds.[7]

At a time not disclosed by the record before August 1999, the Trust learned that conservation of the Taos Overlook was a high priority of the Taos community and that the New Mexico office of the Bureau of Land Management had given the highest priority to the acquisition of that property. During the discussions and the negotiations that followed the meeting in August 1999 between representatives of the Trust and representatives of

---

[6]The Trust was not, however, an agent for the Bureau of Land Management.

[7]In soliciting funds, the Trust relied on so-called grassroots campaigns. The grassroots campaigns included volunteer-based letter writing and telephone calls to congressional representatives and philanthropic donors in support of the Trust's requests for funds.

Klauer Manufacturing, the Trust's representatives informed the

Company's representatives about certain matters that the Trust

considered critical to its ability to acquire, and its continuing

interest in acquiring, a portion or all of the Taos Overlook.

First, the Trust's representatives informed Klauer Manufac-

turing's representatives that the Trust anticipated that its only

source of funding for its acquisition of a portion or all of the

Taos Overlook land would be appropriations that Congress might

authorize.[8]  That was because in the past the Trust's funding for

land acquisition projects relied extensively, sometimes entirely,

on appropriations by Congress.

Second, the Trust's representatives informed the Company's

representatives that the Trust was not in a financial position to

be contractually and thus legally bound to purchase all of the

Taos Overlook (i.e., all of the approximately 2,581 acres of that

---

[8]Any appropriation that Congress might authorize would be to
the U.S. Land and Water Conservation Fund (Land and Water Conser-
vation Fund).  According to the U.S. Forest Service's Web site,
the Land and Water Conservation Fund was created by Congress in
1964 and "provides money to federal, state and local governments
to purchase land, water and wetlands for the benefit of all
Americans."  Http://www.fs.fed.us/land/staff/LWCF/index.shtml.
Congress decides for each fiscal year of the Federal Government
whether to appropriate any funds to, inter alia, the Land and
Water Conservation Fund and, if so, the amount to appropriate.
If Congress had decided to appropriate certain funds for a
particular fiscal year to the Land and Water Conservation Fund,
the Trust would not have been able to use any portion of such
funds unless it were authorized to do so.

property).  That was because congressional appropriations for land acquisition projects were uncertain, limited, and varied from year to year.  There simply were no guaranties that the Trust, which had to solicit funds on an annual basis for specified possible acquisitions, would receive any congressional (or other) funding for the purchase of a portion, let alone all, of the Taos Overlook.[9]  As a result, during their discussions with the Company's representatives the Trust's representatives insisted that the Company grant it an option to purchase annually a portion of the Taos Overlook if and when during each year the Trust had the funds to purchase such a portion.  Although Klauer Manufacturing was willing to do so, its representatives insisted that any portion of the Taos Overlook with respect to which the Company were to grant the Trust an option to purchase during the initial year border an exterior boundary of the Taos Overlook. That was because Klauer Manufacturing wanted to ensure that if the Trust were to decide not to exercise its option to purchase thereafter any of the remaining specified portions of the Taos

_____

[9]In fact, at the time of the discussions between the Trust's representatives and Klauer Manufacturing's representatives regarding the Trust's interest in the Taos Overlook, the largest single annual appropriation that Congress had made to the Land and Water Conservation Fund for land acquisition projects in New Mexico was $3 million.

Overlook, Klauer Manufacturing, and not the Trust, would own the property in the interior of the Taos Overlook.

Third, the Trust's representatives informed the Company's representatives that there should be some bargain-sale component to a sale by the Company of a portion or all of the Taos Overlook. That was because the Trust's management had concluded that the Trust would be in a better position to obtain funding if there were such a charitable component.

When the Trust's representatives first began discussions in August 1999 with Klauer Manufacturing's representatives regarding the Trust's interest in the Taos Overlook, the Company did not have a professional appraisal made of all or any portion of that property. However, Klauer Manufacturing was generally familiar with the fair market value of property in the Taos area and believed that the approximately 2,581 acres known as the Taos Overlook had a fair market value of between $20 and $21 million.[10]

---

[10]Klauer Manufacturing's familiarity with the fair market value of property in the Taos area was attributable in large part to its history of donating, and therefore of having appraisals made of, property that it owned in the Taos area. For example, in 1993, Klauer Manufacturing donated 80 acres of land that it owned in the Taos area to the New Mexico School System for a campus and made a bargain sale of 10 acres of land that it owned in that area to the City of Taos for use as a location for a new National Guard armory.

At a time not disclosed by the record after the initial meeting in August 1999 and before January 23, 2001, the Trust presented Klauer Manufacturing with a proposed option agreement reflecting the discussions and the negotiations between the respective representatives of the Trust and the Company. The Trust's attorney had drafted that proposed option agreement by using as a model an option agreement that the Trust typically employed when it was attempting to acquire land. The Company could have rejected the Trust's proposed option agreement. However, it decided to accept it.

On January 23, 2001, Klauer Manufacturing and the Trust executed a document entitled "OPTION AGREEMENT" (Option Agreement) that was effective as of that date. The Option Agreement provided in pertinent part:

> This is an Agreement with the Effective Date [of January 23, 2001] * * * between KLAUER MANUFACTURING COMPANY, an Iowa corporation ("Sellers"), and THE TRUST FOR PUBLIC LAND, a nonprofit California public benefit corporation authorized to do business in New Mexico ("Buyer").

> RECITALS

> \*        \*        \*        \*        \*        \*        \*

> B.    Sellers are the owners of 2,581 acres, more or less, of real property located in Taos County, New Mexico * * *. Said real property, together with any and all improvements, fixtures, timber, water and/or minerals located thereon and any and all rights appurtenant thereto including but not limited to timber

rights, water rights, grazing rights, access rights, mineral rights, development rights, and all governmental licenses, permits and certificates applicable thereto, shall be referred to in this Agreement as the "Property" or the "Subject Property".

    \*       \*       \*       \*       \*       \*       \*

D.    It is the mutual intention of Sellers and Buyer that the Subject Property be preserved and used eventually for public, open space and habitat purposes. However this intention shall not be construed as a covenant or condition to this Agreement.  Buyer makes no representation that any efforts it may undertake to secure the eventual government acquisition of the Subject Property will be successful.

E.    Sellers acknowledge that Buyer is entering into this Agreement in its own right and that Buyer is not an agent of any governmental agency or entity.

    \*       \*       \*       \*       \*       \*       \*

THE PARTIES AGREE AS FOLLOWS:

1.    <u>Subject Property:  Phases</u>.  For purposes of this Agreement, the Subject Property shall be divided into three (3) parcels, each consisting of 860.33 acres, more [or] less.

    <u>Phase I</u>:  The first phase would consist of approximately one-third of the total acreage, more or less.

    <u>Phase II</u>:  The second phase would consist of approximately one-third of the total acreage, more or less.

    <u>Phase III</u>:  The third phase would consist of approximately one-third of the total acreage, more or less.

The first Phase shall be referred to herein as Phase I ("Phase I").  The second Phase shall be referred to herein as Phase II ("Phase II").  The third

Phase shall be referred to herein as Phase III ("Phase III"). Together the phases may be called the "Phases". Seller will sell and convey to Buyer, and Buyer hereby agrees to purchase and accept from Seller, the Subject Property on the terms and conditions set forth in this Agreement. Conveyance of the Subject Property to Buyer shall occur in three (3) separate closings * * *, one for each Phase. Each Phase shall be finally determined by a survey of said Phase to be conducted by a surveyor mutually agreed to by the parties. Prior to a survey being conducted, the parties shall meet and agree as to the portion of the Property to be included in each Phase. The parties state that it is their agreement that the Phases will run north to south * * * and that Phase I shall include the most westerly portion of the Property, Phase II shall be adjacent to Phase I and shall include the middle portion of the Property and Phase III shall include the most easterly portion of the Property.

2. Options. In consideration of the payment by Buyer to Seller of the payment of Ten Thousand Dollars ($10,000.00) (the "Option Consideration"), receipt of which is hereby acknowledged, Seller grants to Buyer an exclusive and irrevocable option to purchase the Subject Property in three Phases on the terms and conditions set forth in this Agreement (the "Option"). Any Option Consideration paid shall be credited toward the Purchase Price (as defined below) of Phase III of the Subject Property in the event Buyer exercises the Option(s) and closes on the purchase of the three Phases of the Subject Property. Seller shall return the Option Consideration to Buyer if the sale of the Property is not consummated under this Agreement because of Seller's affirmative default under this Agreement, otherwise said option consideration shall be nonrefundable. If Buyer's existence should terminate at any time, then this Agreement shall automatically terminate. The Option Consideration, without interest, shall be credited to the purchase of the Phase III Property. If Phase I is exercised, but either Phase II or Phase III are not exercised, then the Option Consideration shall be retained by Seller, unless the failure to exercise is caused by Seller's affirmative default

under this Agreement, in which event the Option Consideration shall be paid to Buyer.

3.   Term.   Buyer's Phase I Option shall run from the Effective Date of this Agreement to and through February 28, 2001 * * *, within which time, Buyer may exercise said Option.  If, and only if, Buyer exercises the Phase I Option and closes on the purchase of Phase I, then Buyer shall have an Option to purchase Phase II, which shall run from the Closing of Phase I to February 28, 2002.  If, and only if, Buyer exercises the Phase II Option and closes on the purchase of Phase II, then Buyer shall have an Option to purchase Phase III, which shall run from the date of closing on Phase II to February 28, 2003.  If the Option for any Phase is not timely exercised, then it and the balance of any Options existing hereunder shall automatically terminate unless extended by mutual agreement of the parties.

4.   Exercise.   In the event Buyer exercises the Option for either Phase I, Phase II, or Phase III, it shall do so by notifying Seller (the "Notice of Exercise") prior to the end of the Option period(s) specified in Section 3 above.  The Notices of Exercise shall be deemed timely if deposited in the mail, first class postage prepaid, telecopied or delivered personally by courier or Express Mail within the terms and upon the condition specified in Section 3.  If Buyer does not timely deliver the Notice of Exercise for Phase I, then this entire Option shall terminate, and Seller shall retain all Option Consideration previously paid by Buyer, together with any accrued interest thereon.  If Buyer has closed on Phase I and Buyer does not timely deliver the Notice of Exercise for Phase II, then the remainder of this Agreement shall terminate, and Seller shall retain all Option Consideration previously paid or deposited by Buyer, together with any accrued interest thereon.  If Buyer has closed on Phase II and Buyer does not timely deliver the Notice of Exercise for Phase III, then the remainder of this Agreement shall terminate, and Seller shall retain all Option Consideration previously paid or deposited by Buyer, together with any accrued interest thereon.

5.  <u>Purchase Terms</u>.

    a.    <u>Price</u>.

    (1)   The Purchase Price for Phase I shall be Four Million Dollars ($4,000,000.00).  The Purchase Price for Phase II shall be Five Million Dollars ($5,000,000.00).  The Purchase Price for Phase III shall be Five Million Five Hundred Thousand Dollars ($5,500,000.00).

    (2)   Notwithstanding the foregoing, if prior to Closing of any Phase, any governmental regulation, action, statute or ordinance is adopted that negatively, materially affects the fair market value of the Subject Property, Buyer may at its option terminate this Agreement in which case Buyer shall have no obligation to purchase the Subject Property.

    b.  <u>Method of Payment</u>.  Buyer shall pay to Seller in cash or certified funds the Purchase Price for each Phase which is closed at the closing of each Phase.  The parties agree to coordinate payment by wire transfer in order to expedite timely payment.

    c.  <u>Appraisal</u>.  Buyer and Seller shall have an appraisal performed on each Phase of the Property, by appraiser(s) approved by both parties, which appraisals shall be conducted in accordance with the requirements of the Internal Revenue Code for purposes of claiming charitable gifts of real property because the parties believe, as set forth in subsection (d) below that the Property is being sold at less than fair market value.

    d.  <u>Bargain Sale</u>.  Buyer and Seller acknowledge that Buyer is a non-profit corporation qualified under §501(c)(3) of the Internal Revenue Code, is an "eligible donee" as described in Treasury Regulation 1.170A-14(c).  The parties believe the Purchase Price in paragraph 5a. above is significantly less than each Phase's fair market value, thereby making a bargain sale to Buyer.  The Seller intends to take a charitable deduction for the difference between the purchase price and the fair market value of the Property.  Notwith-

standing the foregoing, Seller, at its sole expense, shall pay all costs, expenses and fees incurred in connection with its attempt to realize a charitable deduction in connection with the sale of the Property under this Option Agreement, including, but not limited to, attorneys' fees and accountants' fees.  Seller hereby acknowledges and agrees that Buyer has made no warranty or representation as to Seller's entitlement or ability to realize any tax benefits in connection with this Option Agreement, and Seller will retain independent legal and tax counsel in its attempt to realize any tax benefits therefrom.

6.  Closing.  Final settlement of the obligations of the parties hereto ("Closing") shall be on or before ninety (90) days after the Buyer's exercise of the Option on any particular Phase, or as otherwise agreed to by the parties, at such date, place and time as the parties shall mutually agree. * * * The parties agree that Buyer may arrange a simultaneous closing with a public agency and Sellers will cooperate in coordinating such a simultaneous closing.

7.  Title and Survey.

a.  At closing, Sellers shall convey to Buyer by a General Warranty Deed marketable title to each and every Phase of the Subject Property which is east of the river line and a Quitclaim Deed for any portion of the property in the Rio Grande River.

b.  This Agreement is entered into without the benefit of a current title commitment on the Subject Property.  Within thirty (30) days after the Effective Date, Buyer shall order such a commitment from a title insurance company authorized to do business in Taos County, New Mexico (Escrow Holder), together with copies of all of the documents referred to therein as exceptions.  Not later than thirty (30) days prior to Closing on Phase I or within fourteen (14) days of receipt of the current title commitment and copies of the documents referred to above, whichever date is later, Buyer shall advise Sellers of any nonstandard exceptions in the title commitment which Buyer will require to be removed on or before Closing.  Thereafter

Sellers shall use their best efforts to assure the removal of any such objectionable exceptions by Closing of Phase I, or the Closing on the Phase which contains the title exception.  In the event Sellers are unable to remove any such exceptions to which Buyer has objected Buyer may elect to (1) terminate this Agreement as to a particular Phase or as to all Phases, in which case Buyer shall have no obligation to purchase the Subject Property or any Phase thereof unless already purchased, (2) proceed with the purchase of the Subject Property or any Phase thereof and accept a policy of title insurance with the exceptions to which Buyer objected or (3) defer Closing until the exceptions are removed if Sellers can remove the exceptions with additional time.  In any event, Sellers shall satisfy and discharge all monetary liens and encumbrances (except any statutory liens for nondelinquent real property taxes) affecting the Subject Property.  The parties stipulate and agree that title to the property shall be subject to any and all reservations as set forth in the original patent from the United States of America to the Gijosa land grant.

In the event Buyer terminates this Agreement pursuant to this Section 7(b), Buyer shall be entitled to immediate repayment of all Option Consideration paid for any Phases not then closed.

c. <u>Survey</u>.  This Agreement is entered into without the benefit of a current survey of the Property.  During the term of this Agreement, Buyer, at Buyer['s] sole cost and expense, through its employees, agents or assigns, shall enter upon the Subject Property for the purpose of preparing a survey of the Subject Property, which shall delineate the Phases of the Subject Property.  A copy of the survey shall be delivered by Buyer to Seller, all pursuant to Paragraph 1 hereof.  The parties shall mutually agree on the survey at least thirty (30) days prior to Closing.

The purchase price for each of the three so-called phases of the Taos Overlook set forth in the Option Agreement (i.e., $4 million for phase I, $5 million for phase II, and $5.5 million

for phase III) did not bear any relationship to the fair market value of each such phase. Instead, each such price was based on the Trust's estimate of the amount of funds that the Trust hoped Congress might appropriate for the Trust's acquisition of each such phase during each year specified in the Option Agreement.

If the Trust had been unable to obtain the funds needed to purchase a portion of the Taos Overlook specified in the Option Agreement, it would not have exercised its option under that agreement to purchase any such portion. In that event, Klauer Manufacturing would have retained the portion of the Taos Over-look as to which the Trust did not exercise its option to purchase under the Option Agreement.

The Option Agreement did not require the Trust to exercise any or all of its options to acquire the phases of the Taos Over-look specified in that agreement. Under that agreement, the Trust's exercise of its option to acquire one phase did not obligate it to exercise its option to acquire any other phase. Klauer Manufacturing and the Trust did not have an express or implied agreement or understanding that the Trust would exercise all of its options under the Option Agreement. Nor did Klauer Manufacturing and the Trust have an express or implied agreement or understanding that the Trust would buy, and Klauer Manufacturing would sell, all of the Taos Overlook.

Around February 2001, the Trust believed that it would be able to use certain funds that Congress had appropriated in order to exercise its option to acquire and to acquire phase I of the Taos Overlook.  However, the Trust needed more time than that set forth in the Option Agreement in order to know with certainty that it would be able to use those appropriated funds and to decide whether to exercise its option to acquire and to acquire that phase.  As a result, the Trust asked the Company to extend the date in that agreement (i.e., February 28, 2001) by which the Trust was required to exercise that option.  The Company agreed to extend that date to March 30, 2001.

On February 23, 2001, Klauer Manufacturing and the Trust executed a document entitled "FIRST AMENDMENT TO OPTION AGREE-MENT" (First Amendment) that was effective as of that date.  The First Amendment provided in pertinent part:

RECITALS

A.  Seller [Klauer Manufacturing] and Buyer [the Trust] have previously entered into that certain Option Agreement (the "Option Agreement") for the acquisition of 2,581 acres, more or less, of real property, located in Taos County, New Mexico, in three phases.

B.  Due to additional time being required to complete and review due diligence matters, the parties [the Trust and Klauer Manufacturing] desire to amend the Option Agreement as set forth below.

TERMS

THE PARTIES AGREE AS FOLLOWS:

1. Paragraph 2 of the Option Agreement is amended to provide that the term of the Option [on Phase I] is extended to run to and through March 30, 2001.

2. Paragraph 5 of the Option Agreement is amended to provide that Closing [on Phase I] shall occur on or before March 31, 2001.

3. All terms of the Option Agreement necessarily modified or changed by this amendment are hereby modified and changed and all terms of the Option Agreement not modified or amended hereby remain the same and in full force and effect between the parties.

On March 21, 2001, the board of directors (board) of Klauer Manufacturing passed a resolution approving the sale to the Trust of approximately 860.3 acres of the Taos Overlook that the Company and the Trust agreed constituted what they, and we shall, refer to as phase I. However, any such sale was subject to all of the requirements of the Option Agreement as amended having been satisfied, including those relating to a survey, an appraisal, due diligence regarding title, and due diligence regarding environmental matters, and the Trust's having sent to the Company the notice of exercise of the Trust's option to acquire that phase, as required by the Option Agreement as amended. Around March 21, 2001, the Trust sent to Klauer Manufacturing that notice, which Peter Ives, regional counsel for the Trust,

signed on behalf of the Trust. The subject line of that notice

stated: "RE: Notice of Exercise of Option".

After the Trust sent to Klauer Manufacturing the notice of

exercise of its option to purchase phase I and exercised that

option and after all the other requirements of the Option Agree-

ment as amended were satisfied, the Company was obligated to sell

that phase to the Trust for $4 million. On March 30, 2001,

Klauer Manufacturing sold phase I to the Trust for that amount.

On January 30, 2001, the fair market value of phase I was $6.782

million.[11]

After its sale of phase I to the Trust, Klauer Manufacturing

continued to pay the real estate taxes on and the costs of main-

taining the approximately 1,720.7 acres of the Taos Overlook that

it continued to own after that sale.

After the Trust acquired phase I of the Taos Overlook, it

continued to seek the funding that would enable it to exercise

the option that it had under the Option Agreement as amended to

acquire the next phase, i.e., phase II.[12] At a time not dis-

---

[11]The parties agree that on Mar. 30, 2001, the fair market
value of phase I was the same as its fair market value on Jan.
30, 2001, the date as of which that phase was appraised.

[12]The Trust's search for funds required its representatives
(and others who supported the Trust's objectives) to lobby for
congressional funding by, for example, meeting with certain
(continued...)

closed by the record before April 15, 2001, the Trust learned that the Bureau of Land Management unexpectedly had certain funds to provide to the Trust that would enable the Trust to decide whether it would be in a financial position to exercise its option to acquire and to acquire phase II of the Taos Overlook.[13] The Trust concluded that, even with the unanticipated funds from the Bureau of Land Management, it did not have enough money to exercise its option to acquire and to acquire phase II. However, the Trust believed that those unexpected funds would enable it to acquire approximately 218.6 acres of that phase, provided that Klauer Manufacturing were willing to amend the Option Agreement as amended by the First Amendment in order to grant the Trust separate options to acquire at different times separate portions of phase II of the Taos Overlook. The Company agreed to amend that agreement.

---

[12](...continued)
representatives of Congress, including members of certain congressional committees and their staffs, and sustaining and increasing its grassroots campaigns. Local organizations assisted the Trust in its grassroots campaigns by, inter alia, organizing tours of the Taos Overlook and undertaking a letter-writing campaign to representatives of Congress from New Mexico.

[13]The Bureau of Land Management had funds that were unexpectedly available to the Trust because the Bureau of Land Management's proposed acquisition of certain property had failed to close and the funds that were to have been used for that proposed acquisition became available.

On April 15, 2001, Klauer Manufacturing and the Trust executed a document entitled "SECOND AMENDMENT TO OPTION AGREEMENT" (Second Amendment) that was effective as of that date.  The Second Amendment provided in pertinent part:

RECITALS

A.  Seller [Klauer Manufacturing] and Buyer [the Trust] have previously entered into that certain Option Agreement (the "Option Agreement") for the acquisition of 2581 acres, more or less, of real property, located in Taos County, New Mexico, in three phases.

B.  Due to anticipated opportunities to move portions of the transaction forward on timeframes different than those originally contemplated, the parties [the Trust and Klauer Manufacturing] desire to modify the Option Agreement as set forth below.

TERMS

THE PARTIES AGREE AS FOLLOWS:

1.  Paragraph 1 of the Option Agreement is amended to provide that Buyer may exercise its options as to portions of the Phase II and Phase III[14] tracts of the Property as set forth below.  Exercise of an option on a portion of a Phase shall preserve the option as to any remaining portion of that Phase within the time frame set forth in the Option Agreement for that option.  The Phase II option shall be exercised upon in its entirety before any portion of the Phase III option may be exercised upon.  Any portion of any Phase so exercised shall abut and share a common line with that

---

[14]Klauer Manufacturing and the Trust included phase III in the Second Amendment to provide for the possibility that, as was true of phase II, the Trust would not have the funds that would enable it to exercise its option to acquire and to acquire all of phase III but would have the funds to acquire one or more portions of that phase.

portion of the entire Property previously conveyed by the Seller to the Buyer.

2. Paragraph 5(c) of the Option Agreement is amended to provide that an appraisal shall be performed of each and every portion of any Phase of the Property and that the appraisal, and the Closing on any such portion of any Phase, shall be subject to the review and approval of the appraisal by the Seller and the Buyer.

3. All terms of the Option Agreement necessarily modified or changed by this amendment are hereby modified and changed and all terms of the Option Agreement not modified or amended hereby remain the same and in full force and effect between the parties.

Pursuant to the Option Agreement as amended, the Trust exercised its option to acquire with the unanticipated funds from the Bureau of Land Management approximately 218.6 acres of phase II, which the Company and the Trust agreed constituted what they, and we shall, refer to as phase IIA.

On August 30, 2001, Klauer Manufacturing's board passed a resolution approving the sale to the Trust of phase IIA. However, any such sale was subject to all of the requirements of the Option Agreement as amended having been satisfied, including those relating to a survey, an appraisal, due diligence regarding title, and due diligence regarding environmental matters, and the Trust's having sent to the Company the notice of exercise of the Trust's option to acquire that phase, as required by the Option Agreement as amended. Around August 30, 2001, the Trust sent to Klauer Manufacturing that notice.

After (1) the Trust sent to Klauer Manufacturing the notice of exercise of its option to purchase phase IIA and exercised that option, (2) both Klauer Manufacturing and the Trust reviewed and approved the appraisal of the fair market value of phase IIA (i.e., $1.687 million) that had been obtained, and (3) all the other requirements of the Option Agreement as amended were satisfied, the Company was obligated to sell phase IIA to the Trust. On September 5, 2001, Klauer Manufacturing sold phase IIA to the Trust for $1.687 million.[15]

After its sale of phase IIA to the Trust, Klauer Manufacturing continued to pay the real estate taxes on and the costs of maintaining the approximately 1,502.1 acres of the Taos Overlook that it continued to own after that sale.

The Trust continued to seek the funding that would enable it to exercise the option that it had under the Option Agreement as amended to acquire a portion or all of the remainder of phase II.[16]  As was true of the unexpected funding that became available to the Trust with respect to its purchase of phase IIA, the Trust learned of another unexpected source of funds that would enable it to decide whether it would be in a financial position

---

[15]The parties agree that on Sept. 5, 2001, the fair market value of phase IIA was the same as its fair market value on June 3, 2001, the date as of which that phase was appraised.

[16]See supra note 12.

to exercise its option to acquire and to acquire a portion or all of the remainder of phase II.  That unexpected source of funds was the Native American Tribe from San Felipe Pueblo (San Felipe Pueblo tribe).

At a time not disclosed by the record after February 23, 2001, and before June 3, 2001, the Trust became aware that the San Felipe Pueblo tribe was interested in acquiring certain land that the Bureau of Land Management owned and that was of cultural significance to that tribe.  However, that tribe was unable to acquire directly from the Bureau of Land Management the land that it wanted.  In an effort to assist the San Felipe Pueblo tribe in acquiring that land and to provide itself with the funds that it needed to exercise its option to acquire and to acquire a portion of the remainder of phase II of the Taos Overlook, the Trust proposed the following arrangement to that tribe and the Bureau of Land Management:  The San Felipe Pueblo tribe would provide to the Trust the funds that the Trust would need to acquire approximately 268.7 acres of the remainder of phase II of the Taos Overlook, which the Company and the Trust agreed constituted what they, and we shall, refer to as phase IIB.  The Trust would exercise its option to, and would, acquire phase IIB, and it would then convey that phase to the San Felipe Pueblo tribe.  Thereafter, the Bureau of Land Management would convey to that tribe the

land that it owned and that that tribe wanted in exchange for phase IIB.  The San Felipe Pueblo tribe and the Bureau of Land Management agreed to the Trust's proposed arrangement.  That tribe provided the Trust with the funds that it needed to acquire phase IIB from the Company.

On August 14, 2001, the Trust sent to Klauer Manufacturing the notice of exercise of the Trust's option to acquire phase IIB.[17]  The subject line of that notice stated:  "Re: Klauer Man-ufacturing Company/The Trust For Public Land".  In addition, the Trust and Klauer Manufacturing undertook to satisfy all of the other requirements of the Option Agreement as amended.

After (1) the Trust sent to Klauer Manufacturing the notice of exercise of its option to purchase phase IIB and exercised that option, (2) both Klauer Manufacturing and the Trust reviewed and approved the appraisal of the fair market value of phase IIB (i.e., $1.89 million) that had been obtained, and (3) all the other requirements of the Option Agreement as amended were satis-fied, the Company was obligated to sell phase IIB to the Trust.

---

[17]The record does not establish whether the Company's board passed a resolution approving the sale of phase IIB, but we presume that it did.

On December 10, 2001, Klauer Manufacturing sold phase IIB to the Trust for $1.89 million.[18]

After the Company's sale to the Trust of phase IIB, as previously arranged with the San Felipe Pueblo tribe and the Bureau of Land Management, the Trust conveyed that phase to that tribe. Thereafter, the San Felipe Pueblo tribe exchanged phase IIB for the land that the Bureau of Land Management owned and that the tribe wanted to acquire.

After its sale of phase IIB to the Trust, Klauer Manufacturing continued to pay the real estate taxes on and the costs of maintaining the approximately 1,233.4 acres of the Taos Overlook that it continued to own after that sale.

After the Trust acquired phase IIB of the Taos Overlook, it continued to seek the funding that would enable it to exercise the options that it had under the Option Agreement as amended to acquire the remainder of phase II and a portion or all of phase III.[19] The Trust's efforts focused on obtaining approval to use $5 million that Congress had appropriated to the Land and Water Conservation Fund.

---

[18]The parties agree that on Dec. 10, 2001, the fair market value of phase IIB was the same as its fair market value on June 3, 2001, the date as of which that phase was appraised.

[19]See supra note 12.

At a time not disclosed by the record after June 3, 2001, and before February 15, 2002, the Trust became aware that Klauer Manufacturing was dissatisfied with the appraised value of certain property that the Trust had acquired from the Company pursuant to the Option Agreement as amended.  In an effort to minimize the likelihood that Klauer Manufacturing would not approve the appraisal, which Klauer Manufacturing (as well as the Trust) had the right to do under paragraph 2 of the Second Amendment, of one or more portions of the Taos Overlook which the Company still owned and with respect to which the Trust were to exercise its option to acquire under the Option Agreement as amended, the Trust proposed a $500,000 increase in the aggregate amount of consideration that it would pay to Klauer Manufacturing in the event that the Trust were to decide to exercise its remaining options under that agreement.  Klauer Manufacturing agreed to that proposal.[20]

On February 15, 2002, Klauer Manufacturing and the Trust executed a document entitled "THIRD AMENDMENT TO OPTION AGREE-MENT" (Third Amendment) that was effective as of that date.  The Third Amendment provided in pertinent part:

---

[20]The Company also agreed to extend by one month the date in the Option Agreement as amended by which the Trust was required to exercise its option to acquire the remainder of phase II.

RECITALS

A.  Seller [Klauer Manufacturing] and Buyer [the Trust] have previously entered into that certain Option Agreement, as amended (collectively the "Option Agreement") for the acquisition of 2581 acres, more or less, of real property, located in Taos County, New Mexico, in three phases.

B.  In order to increase the total consideration to be paid and eliminate problems associated with the appraisal process, the parties [the Trust and Klauer Manufacturing] desire to modify the Option Agreement as set forth below.

TERMS

THE PARTIES AGREE AS FOLLOWS:

1.  Paragraph 5(a)(1) of the Option Agreement is amended to provide that Buyer shall pay to Seller a total of $15,000,000 for acquisition of all of the three Phases and portions thereof.

2.  Buyer's option on the remainder of Phase II shall be extended from February 28, 2002, to and through March 28, 2002.  Closing shall occur on or before March 31, 2002.

3.  All terms of the Option Agreement necessarily modified or changed by this amendment are hereby modified and changed and all terms of the Option Agreement not modified or amended hereby remain the same and in full force and effect between the parties.

Around the end of 2001 or the beginning of 2002, the Trust learned that it was authorized to use $4.5 million, but not the $5 million that the Trust had sought, of funds that Congress had appropriated to the Land and Water Conservation Fund.  The Trust decided to use those funds in order to acquire 700 acres of the Taos Overlook, which the Company and the Trust agreed constituted

what they, and we shall, refer to as phase IIC.  As a result, the Trust decided to exercise its option under the Option Agreement as amended to acquire that phase.

On March 28, 2002, Klauer Manufacturing's board passed a resolution approving the sale to the Trust of phase IIC.  However, any such sale was subject to all of the requirements of the Option Agreement as amended having been satisfied, including those relating to a survey, an appraisal, due diligence regarding title, and due diligence regarding environmental matters, and the Trust's having sent to the Company the notice of exercise of the Trust's option to acquire that phase, as required by the Option Agreement as amended.  On March 28, 2002, the Trust sent to Klauer Manufacturing that notice, which Sarae Leuckel (Ms. Leuckel),[21] regional counsel for the Trust, signed.  The subject line of the notice that the Trust sent to the Company stated:

> Re: **Notice of Exercise** pursuant to Option Agreement effective as of January 23, 2001, as amended, between Klauer Manufacturing Company, an Iowa corporation and The Trust for Public Land, a non-profit California public benefit corporation authorized to do business in New Mexico pertaining to approximately 2,581 acres, more or less, of real property located in Taos County, New Mexico (the "Property")

---

[21]Ms. Leuckel had personal knowledge of (1) the Trust's interest in the Taos Overlook and (2) the Option Agreement.

After (1) the Trust sent to Klauer Manufacturing the notice of exercise of its option to purchase phase IIC and exercised that option, (2) both Klauer Manufacturing and the Trust reviewed and approved the appraisal of the fair market value of phase IIC (i.e., $5.721 million) that had been obtained, and (3) all the other requirements of the Option Agreement as amended were satisfied, the Company was obligated to sell phase IIC to the Trust. On March 28, 2002, Klauer Manufacturing sold phase IIC to the Trust for $4.5 million.[22]

After its sale of phase IIC to the Trust, Klauer Manufacturing continued to pay the real estate taxes on and the costs of maintaining the approximately 533.4 acres of the Taos Overlook that it continued to own after that sale.

The Trust continued to seek the funding that would enable it to exercise the option that it had under the Option Agreement as amended to acquire a portion or all of the next phase, i.e., phase III.[23] As was true of the unexpected funding that became available to the Trust with respect to its purchases of phase IIA and phase IIB, the Trust learned of another unexpected source of funds that would enable it to decide whether it would be in a

_____

[22]The parties agree that on Mar. 28, 2002, the fair market value of phase IIC was the same as its fair market value on Feb. 5, 2002, the date as of which that phase was appraised.

[23]See supra note 12.

financial position to exercise its option to acquire and to acquire a portion or all of phase III. That unexpected source of funds was the Native American Tribe from Santo Domingo Pueblo (Santo Domingo Pueblo tribe).

At a time not disclosed by the record before February 5, 2002, the Trust became aware that the Santo Domingo Pueblo tribe was interested in acquiring certain land that the Bureau of Land Management owned and that was of cultural significance to that tribe. However, as was true of the San Felipe Pueblo tribe, the Santo Domingo Pueblo tribe was unable to acquire directly from the Bureau of Land Management the land that it wanted. In an effort to assist the Santo Domingo Pueblo tribe in acquiring that land and to provide itself with the funds that it needed to exercise its option to acquire and to acquire a portion of phase III, the Trust proposed the following arrangement to that tribe and the Bureau of Land Management: The Santo Domingo Pueblo tribe would provide to the Trust the funds that the Trust would need to acquire approximately 161.3 acres of phase III of the Taos Overlook, which the Company and the Trust agreed constituted what they, and we shall, refer to as phase IIIA. The Trust would exercise its option to, and would, acquire phase IIIA, and it would then convey that phase to the Santo Domingo Pueblo tribe. Thereafter, the Bureau of Land Management would convey to that

tribe the land that it owned and that that tribe wanted in exchange for phase IIIA.  The Santo Domingo Pueblo tribe and the Bureau of Land Management agreed to the Trust's proposed arrangement.  That tribe provided the Trust with the funds that it needed to acquire phase IIIA from the Company.

On May 13, 2002, Klauer Manufacturing's board passed a resolution approving the sale to the Trust of phase IIIA.  However, any such sale was subject to all of the requirements of the Option Agreement as amended having been satisfied, including those relating to a survey, an appraisal, due diligence regarding title, and due diligence regarding environmental matters, and the Trust's having sent to the Company the notice of exercise of the Trust's option to acquire that phase, as required by the Option Agreement as amended.  Around May 13, 2002, the Trust sent to Klauer Manufacturing that notice.

After (1) the Trust sent to Klauer Manufacturing the notice of exercise of its option to purchase phase IIIA and exercised that option, (2) both Klauer Manufacturing and the Trust reviewed and approved the appraisal of the fair market value of phase IIIA (i.e., $1.31 million) that had been obtained, and (3) all the other requirements of the Option Agreement as amended were satisfied, the Company was obligated to sell phase IIIA to the Trust.

On May 14, 2002, Klauer Manufacturing sold phase IIIA to the Trust for $1.31 million.[24]

After the Company's sale to the Trust of phase IIIA, as previously arranged with the Santo Domingo Pueblo tribe and the Bureau of Land Management, the Trust conveyed that phase to that tribe. Thereafter, the Santo Domingo Pueblo tribe exchanged phase IIIA for the land that the Bureau of Land Management owned and that the tribe wanted to acquire.

After its sale of phase IIIA to the Trust, Klauer Manufacturing continued to pay the real estate taxes on and the costs of maintaining the approximately 372.1 acres of the Taos Overlook that it continued to own after that sale.

After the Trust acquired phase IIIA of the Taos Overlook, it continued to seek the funding that would enable it to exercise the option that it had under the Option Agreement as amended to acquire a portion or all of the remainder of phase III.[25] At a time not disclosed by the record in late 2002 or early 2003, the Trust believed that it would be able to use certain funds that Congress had appropriated to the Land and Water Conservation Fund in order to acquire the remainder of phase III consisting of

---

[24]The parties agree that on May 14, 2002, the fair market value of phase IIIA was the same as its fair market value on Feb. 5, 2002, the date as of which that phase was appraised.

[25]See supra note 12.

approximately 372 acres of the Taos Overlook, which the Company and the Trust agreed constituted what they, and we shall, refer to as phase IIIB.  However, the Trust needed more time than that set forth in the Option Agreement in order to know with certainty that it would be able to use those funds and to decide whether to exercise its option to acquire and to acquire phase IIIB.  As a result, the Trust asked the Company to extend the date in that agreement (i.e., February 28, 2003) by which the Trust was required to exercise that option.  The Company agreed to extend that date to March 28, 2003.

On February 28, 2003, Klauer Manufacturing and the Trust executed a document entitled "FOURTH AMENDMENT TO OPTION AGREE-MENT" (Fourth Amendment).  The Fourth Amendment provided in pertinent part:

RECITALS

A.  Seller [Klauer Manufacturing] and Buyer [the Trust] have previously entered into that certain Option Agreement, as amended (collectively the "Option Agreement"), for the acquisition of 2,581 acres, more or less, of real property, located in Taos County, New Mexico, in three phases.

B.  The parties [the Trust and Klauer Manufacturing] desire to amend the Option Agreement as set forth below.

TERMS

THE PARTIES AGREE AS FOLLOWS:

1.  Buyer's option on Phase III shall be extended from February 28, 2003, to and through March 28, 2003. Closing shall occur on or before March 31, 2003.

2.  All terms of the Option Agreement necessarily modified or changed by this amendment are hereby modified and changed and all terms of the Option Agreement not modified or amended hereby remain the same and in full force and effect between the parties.

At a time not disclosed by the record after February 28, 2003, the Trust learned that it was authorized to use certain funds that Congress had appropriated to the Land and Water Conservation Fund. The Trust decided to use those funds in order to acquire phase IIIB. As a result, the Trust decided to exercise its option under the Option Agreement as amended to acquire that phase.

On March 13, 2003, Klauer Manufacturing's board passed a resolution approving the sale to the Trust of phase IIIB. However, any such sale was subject to all of the requirements of the Option Agreement as amended having been satisfied, including those relating to a survey, an appraisal, due diligence regarding title, and due diligence regarding environmental matters, and the Trust's having sent to the Company the notice of exercise of the Trust's option to acquire that phase, as required by the Option Agreement as amended. On March 28, 2003, the Trust sent to

Klauer Manufacturing that notice, which Peter Ives signed.  The
subject line of that notice stated:

> Re:  Notice pursuant to Option Agreement effective
>      as of January 23, 2001, as amended, between
>      * * * Klauer Manufacturing Company and The
>      Trust for Public Land, a nonprofit California
>      public benefit corporation authorized to do
>      business in New Mexico pertaining to 2,581
>      acres, more or less, of real property located
>      in Taos County, New Mexico

After (1) the Trust sent to Klauer Manufacturing the notice
of exercise of its option to purchase phase IIIB and exercised
that option, (2) both Klauer Manufacturing and the Trust reviewed
and approved the appraisal of the fair market value of phase IIIB
(i.e., $3.06 million) that had been obtained, and (3) all the
other requirements of the Option Agreement as amended were satis-
fied, the Company was obligated to sell that phase to the Trust.
On March 30, 2003, Klauer Manufacturing sold phase IIIB to the
Trust for $1.613 million.[26]

After the Trust exercised its options under the Option
Agreement as amended and acquired all of the Taos Overlook, it
transferred to the Bureau of Land Management any portion of the
Taos Overlook that had not previously been transferred to that
Bureau.  Thereafter, that Bureau incorporated the Taos Overlook

---

[26]The parties agree that on Mar. 30, 2003, the fair market
value of phase IIIB was the same as its fair market value on Jan.
15, 2003, the date as of which that phase was appraised.

into an area known as the Orilla Verde Recreation Area that it owned.[27]

Klauer Manufacturing filed Form 1120S, U.S. Income Tax Return for an S Corporation (Form 1120S), for taxable year 2001 (2001 S corporation return). In that return, Klauer Manufacturing claimed a charitable contribution deduction of $2,935,619, which included an amount that Klauer Manufacturing claimed with respect to the sale of phase I. The Company reported the charitable contribution deduction claimed with respect to the sale of that phase in Form 8283, Noncash Charitable Contributions (Form 8283), that it included with the 2001 S corporation return (2001 Form 8283).[28]

Klauer Manufacturing issued to each stockholder petitioner 2001 Schedule K-1. In each of those schedules, Klauer Manufacturing reported as a charitable contribution deduction each stockholder petitioner's proportionate share of the Company's

_____

[27]In March 2003, a plaque was erected at the Taos Overlook to commemorate William J. Klauer and his commitment to the preservation of the Taos Overlook.

[28]The Court is unable to reconcile (1) certain amounts claimed in the 2001 Form 8283 and certain amounts reported in Schedule K-1, Shareholder's Share of Income, Credits, Deductions, etc. (Schedule K-1), that Klauer Manufacturing issued to each of its stockholders for 2001 (2001 Schedule K-1) with (2) certain amounts that the parties stipulated. However, reconciliation of those amounts is not necessary to our resolution of the issue presented in these cases.

claimed charitable contribution deduction, including the amount that Klauer Manufacturing claimed with respect to the sale of phase I.[29]

Petitioners or petitioner, as the case may be, in each of these cases filed Form 1040, U.S. Individual Income Tax Return (Form 1040), for taxable year 2001 that included Schedule A-- Itemized Deductions (Schedule A) for that year (2001 Schedule A). Those respective 2001 Schedules A showed charitable contribution deductions which included stockholder petitioners' respective proportionate shares of Klauer Manufacturing's claimed charitable contribution deduction that Klauer Manufacturing showed in the 2001 Schedules K-1 that the Company issued to them, including the amount that Klauer Manufacturing claimed with respect to the sale of phase I.

Klauer Manufacturing filed Form 1120S for taxable year 2002 (2002 S corporation return). In that return, Klauer Manufacturing claimed a charitable contribution deduction of $1,227,934, which included an amount that Klauer Manufacturing claimed with respect to the sale of phase IIC. The Company reported the charitable contribution deduction claimed with respect to the sale of

_____

[29]See supra note 28.

that phase in Form 8283 that it included with the 2002 S corpora-
tion return (2002 Form 8283).[30]

Klauer Manufacturing issued to each stockholder petitioner
2002 Schedule K-1.  In each of those schedules, Klauer Manufac-
turing reported as a charitable contribution deduction each
stockholder petitioner's proportionate share of the Company's
claimed charitable contribution deduction, including the amount
that Klauer Manufacturing claimed with respect to the sale of
phase IIC.[31]

Petitioners or petitioner, as the case may be, in each of
these cases filed Form 1040 for taxable year 2002 that included
Schedule A for that year (2002 Schedule A).  Those respective
2002 Schedules A showed charitable contribution deductions which
included stockholder petitioners' respective proportionate shares
of Klauer Manufacturing's claimed charitable contribution deduc-
tion that Klauer Manufacturing showed in the 2002 Schedules K-1
that the Company issued to them, including the amount that Klauer
Manufacturing claimed with respect to the sale of phase IIC.

_____

[30]The Court is unable to reconcile (1) certain amounts
claimed in the 2002 Form 8283 and certain amounts reported in
Schedule K-1 that Klauer Manufacturing issued to each of its
stockholders for 2002 (2002 Schedule K-1) with (2) certain
amounts that the parties have stipulated.  However, reconcilia-
tion of those amounts is not necessary to our resolution of the
issue presented in these cases.

[31]See supra note 30.

Klauer Manufacturing filed Form 1120S for taxable year 2003 (2003 S corporation return). In that return, Klauer Manufacturing claimed a charitable contribution deduction of $1,665,251, which included an amount that Klauer Manufacturing claimed with respect to the sale of phase IIIB. The Company reported the charitable contribution deduction claimed with respect to the sale of that phase in Form 8283 that it included with the 2003 S corporation return.

Klauer Manufacturing issued to each stockholder petitioner Schedule K-1 for taxable year 2003 (2003 Schedule K-1). In each of those schedules, Klauer Manufacturing reported as a charitable contribution deduction each stockholder petitioner's proportionate share of the Company's claimed charitable contribution deduction, including the amount that Klauer Manufacturing claimed with respect to the sale of phase IIIB.

Petitioners or petitioner, as the case may be, in each of these cases filed Form 1040 for taxable year 2003 that included Schedule A for that year (2003 Schedule A).[32] Those respective 2003 Schedules A showed charitable contribution deductions which included stockholder petitioners' respective proportionate shares of Klauer Manufacturing's claimed charitable contribution deduc-

---

[32]As noted previously, the record does not contain a tax return for petitioner Justin E. Klauer for his taxable year 2003.

tion that Klauer Manufacturing showed in the 2003 Schedules K-1 that the Company issued to them, including the amount that Klauer Manufacturing claimed with respect to the sale of phase IIIB.

Respondent issued respective notices for taxable year 2001 to petitioners in these cases.[33] In those notices, respondent determined to disallow the amount claimed by Klauer Manufacturing as a charitable contribution deduction with respect to its sale of phase I. As a result, respondent further determined (1) to disallow each stockholder petitioner's proportionate share of Klauer Manufacturing's claimed charitable contribution deduction attributable to that sale and (2) to decrease the itemized deductions claimed in each such petitioner's 2001 Schedule A.

Respondent issued respective notices for taxable year 2002 to petitioners in these cases.[34] In those notices, respondent determined to disallow the amount claimed by Klauer Manufacturing as a charitable contribution deduction with respect to its sale of phase IIC. As a result, respondent further determined (1) to disallow each stockholder petitioner's proportionate share of Klauer Manufacturing's claimed charitable contribution deduction

---

[33]Respondent issued to petitioner William R. Klauer in the case at docket No. 18181-07 one notice for all three of his taxable years 2001, 2002, and 2003.

[34]See supra note 33.

attributable to that sale and (2) to decrease the itemized deductions claimed in each such petitioner's 2002 Schedule A.

Respondent issued respective notices for taxable year 2003 to petitioners in these cases.[35]  In those notices, respondent determined to disallow the amount claimed by Klauer Manufacturing as a charitable contribution deduction with respect to its sale of phase IIIB.  As a result, respondent further determined (1) to disallow each stockholder petitioner's proportionate share of Klauer Manufacturing's claimed charitable contribution deduction attributable to that sale and (2) to decrease the itemized deductions claimed in each such petitioner's 2003 Schedule A.

OPINION

Petitioners bear the burden of proving that the determinations that remain at issue in their respective notices are wrong.[36]  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Petitioners bear the burden of proving entitlement to any deduction claimed.  See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

---

[35]As noted previously, the record does not contain a notice issued to petitioner Justin E. Klauer for his taxable year 2003. See supra note 33 with respect to petitioner William R. Klauer.

[36]Petitioners do not claim that the burden of proof shifts to respondent under sec. 7491(a).

Section 170(a) allows a deduction for any charitable contribution, as defined in section 170(c), that is made during the taxable year. A taxpayer who sells property for less than its fair market value (i.e., makes a "bargain sale") to a charitable organization is entitled to a charitable contribution deduction under section 170(a) that is equal to the difference between the fair market value of the property and the amount realized from its sale. See sec. 170; Stark v. Commissioner, 86 T.C. 243, 255-256 (1986). In order to be entitled to a deduction under section 170, a taxpayer must satisfy certain requirements prescribed by regulations under that section. See sec. 170(a)(1); Stark v. Commissioner, supra at 256; sec. 1.170A-1, Income Tax Regs. The parties agree that Klauer Manufacturing complied with those requirements. The parties' sole disagreement here concerns whether the respective sales of phase I in 2001, phase IIC in 2002, and phase IIIB in 2003 were bargain sales by Klauer Manufacturing to the Trust for which the Company is entitled to charitable contribution deductions for those respective years.

It is petitioners' position that the Company's respective sales to the Trust of phase I in 2001, phase IIC in 2002, and phase IIIB in 2003 were bargain sales. That is because, according to petitioners, Klauer Manufacturing sold each of those

phases to the Trust for a sale price that was less than its fair market value on the date of sale.[37]

It is respondent's position that none of the sales of phase I in 2001, phase IIC in 2002, and phase IIIB in 2003 was a bargain sale. That is because, according to respondent, under the step transaction doctrine Klauer Manufacturing should be treated as having sold to the Trust in a single transaction on January 23, 2001, the effective date of the Option Agreement, the approximately 2,581 acres of the Taos Overlook, which the parties agree had a fair market value on that date of $15 million, for which the Company received from the Trust total cash consideration of $15 million, which is the total amount that the Trust paid to the Company in 2001, 2002, and 2003 to acquire all of the various phases of the Taos Overlook.

In order to resolve the parties' disagreement over whether the Company made a bargain sale to the Trust in each of the years 2001, 2002, and 2003, we must determine whether, as respondent argues, it is appropriate to apply the step transaction doctrine.[38]

---

[37]The parties are in agreement as to the respective fair market values of phase I, phase IIC, and phase IIIB on the dates on which Klauer Manufacturing transferred those phases to the Trust.

[38]The parties agree that if the Court were to find that the
(continued...)

The step transaction doctrine is intended to ensure that the tax consequences of a transaction turn on its substance rather than its form. King Enters., Inc. v. United States, 189 Ct. Cl. 466, 476, 418 F.2d 511, 517 (1969). In a case in which substance and form do not diverge, the doctrine has no application. See Sheppard v. United States, 176 Ct. Cl. 244, 256, 361 F.2d 972, 978 (1966).

The step transaction doctrine developed from the substance over form doctrine.[39] See Associated Wholesale Grocers, Inc. v. United States, 927 F.2d 1517, 1521 (10th Cir. 1991). We have considered the principles of the step transaction doctrine on many occasions. Those principles can be summarized by restating what we said about them in Penrod v. Commissioner, 88 T.C. 1415, 1428-1430 (1987):

_____

[38](...continued)
step transaction doctrine applies, petitioners would not be entitled to the charitable contribution deductions at issue and that if the Court were to find that the step transaction doctrine does not apply, petitioners would be entitled to those deductions.

[39]Under the substance over form doctrine, although the form of a transaction may literally comply with the provisions of the Code, that form will not be given effect where it has no business purpose and operates simply as a device to conceal the true character of a transaction. See Gregory v. Helvering, 293 U.S. 465, 469-470 (1935). If, however, the substance of a transaction accords with its form, that form will be upheld and given effect for tax purposes. See Blueberry Land Co. v. Commissioner, 361 F.2d 93, 100-101 (5th Cir. 1966), affg. 42 T.C. 1137 (1964).

The step transaction doctrine is in effect another rule of substance over form; it treats a series of formally separate "steps" as a single transaction if such steps are in substance integrated, interdependent, and focused toward a particular result. * * * There is no universally accepted test as to when and how the step transaction doctrine should be applied to a given set of facts. Courts have applied three alternative tests in deciding whether to invoke the step transaction doctrine in a particular situation.

The narrowest alternative is the "binding commitment" test, under which a series of transactions are collapsed if, at the time the first step is entered into, there was a binding commitment to undertake the later step. See <u>Commissioner v. Gordon</u>, 391 U.S. 83, 96 (1968); * * *

At the other extreme, the most far-reaching alternative is the "end result" test. Under this test, the step transaction doctrine will be invoked if it appears that a series of formally separate steps are really prearranged parts of a single transaction intended from the outset to reach the ultimate result. See <u>King Enterprises, Inc. v. United States</u>, 418 F.2d at 516; * * *

The third test is the "interdependence" test, which focuses on whether "the steps are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." <u>Redding v. Commissioner</u>, 630 F.2d at 1177; * * *

Steps that are transitory, meaningless, or lacking in a nontax, business purpose may be disregarded for purposes of determining the true nature of a transaction. See <u>Minn. Tea Co. v. Helvering</u>, 302 U.S. 609, 613 (1938).

Substance over form and related doctrines all require "a searching analysis of the facts to see whether the true substance

of the transaction is different from its form or whether the form reflects what actually happened." Harris v. Commissioner, 61 T.C. 770, 783 (1974). The determination of whether the step transaction doctrine should be applied involves an intensely factual inquiry. See Gordon v. Commissioner, 85 T.C. 309, 327 (1985).

Although a particular set of facts might satisfy more than one of the tests that is used to determine whether to apply the step transaction doctrine to that particular situation, satisfaction of only one of those tests is sufficient to cause that doctrine to apply. True v. United States, 190 F.3d 1165, 1174-1175 (10th Cir. 1999).

We shall now consider each of the three tests that is used in determining whether to invoke the step transaction doctrine. That is because respondent argues that each of those tests requires the Court to apply that doctrine in resolving the issue presented in these cases.

We turn first to the binding commitment test, which is the most restrictive test. That test "requires telescoping several steps into one transaction only if a binding commitment existed as to the second step at the time the first step was taken." Sec. Indus. Ins. Co. v. United States, 702 F.2d 1234, 1245 (5th

Cir. 1983) (citing <u>Commissioner v. Gordon</u>, 391 U.S. 83, 96 (1968)).[40]

Respondent argues that "The Option Agreement between Klauer Manufacturing and the TPL [Trust] is an example of a binding commitment by a taxpayer to take a series of steps towards a predetermined goal."  In support of that argument, respondent asserts:

> By taking the first step of entering into the Option Agreement, Klauer Manufacturing was bound and obligated to convey to the TPL [Trust] the parcels of property making up the three phases of the Option Agreement on receipt of a timely notice by the TPL of its intent to exercise an option and on the appearance at a closing of the TPL ready and willing to pay the purchase price. Klauer Manufacturing could not unreasonably refuse to convey the property for each of the several phases as they came due over the several years of the Option Agreement so long as the TPL abided by its terms.

---

[40]According to the U.S. Court of Appeals for the Fifth Circuit in <u>Sec. Indus. Ins. Co. v. United States</u>, 702 F.2d 1234, 1245 (5th Cir. 1983),

> Subsequent decisions, however, have tended to confine [Commissioner v.] <u>Gordon</u>[, 391 U.S. 83, 96 (1968),] to its facts.  The Seventh Circuit, for example, has concluded that lack of a "binding commitment" should be determinative only in cases involving multi-year transactions; in other situations, the presence or absence of a "binding commitment" is simply one factor to be considered.  See <u>McDonald's Restaurants v. Commissioner</u>, 688 F.2d 520, 525 (7th Cir. 1982); <u>Redding</u>, 630 F.2d at 1178.  Similarly, the Court of Claims has read <u>Gordon</u>'s "binding commitment" requirement as limited to an interpretation of particular statutory language in section 355 concerning divisive reorganizations.  See <u>King Enterprises</u>[, Inc. v. United States], 418 F.2d at 517-18. * * *

On the other hand, the TPL turned over every funding rock that it could find to complete the acquisition of the TVO [Taos Overlook]. They lobbied Congress for appropriations. They joined in a grass roots campaign to urge the community, local elected officials and business leaders to send letters to the New Mexico Congressional Delegation in support of the acquisition of the TVO. They procured funding through the reprogramming of money appropriated for use by the BLM [Bureau of Land Management] in a project that did not close. They used an exchange of land with a Native American tribe to facilitate the closing of three of the phases. The TPL was committed to the purchase of the 2,581 acres of the TVO. Its commitment then bound Klauer Manufacturing to the sale [for $15 million[41]] of the TVO from the date of signing of the Option Agreement in [January] 2001.

On the record before us, we reject various assertions of respondent in support of respondent's argument that the binding commitment test is applicable in these cases. Those assertions ignore facts that we have found on the record before us, including the following facts.

The Trust's funding for land acquisition projects had in the past relied extensively, sometimes entirely, on appropriations by Congress. Appropriations that Congress made each year for land acquisition projects were uncertain, limited, and varied from year to year. As a result, there simply were no guaranties that the Trust, which had to solicit funds on an annual basis for

---

[41]According to respondent, "Klauer Manufacturing promised to convey the TVO [Taos Overlook] to the TPL [Trust] for $15,000,000 within the periods described in their [Option] agreement [signed on Jan. 23, 2001]."

specified possible acquisitions, would receive any congressional (or other) funding for the purchase of a portion, let alone all, of the Taos Overlook.[42]

If the Trust had been unable to obtain the funds needed to purchase a portion of the Taos Overlook specified in the Option Agreement, it would not have exercised its option under that agreement to purchase any such portion. In that event, Klauer Manufacturing would have retained the portion of the Taos Overlook as to which the Trust did not exercise its option to purchase under the Option Agreement. The Option Agreement did not require the Trust to exercise any or all of its options to acquire the phases of the Taos Overlook specified in that agreement. Nor did the Trust's exercise of its option to acquire one phase obligate it to exercise its option to acquire any other phase. Klauer Manufacturing and the Trust did not have an express or implied agreement or understanding (1) that the Trust would exercise all of its options under the Option Agreement and (2) that the Trust would buy, and Klauer Manufacturing would sell, all of the Taos Overlook.[43]

---

[42]In fact, the Trust's funding for three of the purchases that it made under the Option Agreement as amended was from sources that were unanticipated when Klauer Manufacturing and the Trust executed the Option Agreement on Jan. 23, 2001.

[43]On the record before us, we reject respondent's assertions
(continued...)

On the record before us, we find that on January 23, 2001, the effective date of the Option Agreement between Klauer Manufacturing and the Trust, Klauer Manufacturing did not have an obligation to sell to the Trust, and the Trust did not have an obligation to buy from Klauer Manufacturing, the approximately 2,581 acres of the Taos Overlook for $15 million.[44]  On that re-

---

[43](...continued)
(1) that the Trust's efforts to seek the funding that would enable it to exercise in each of the years 2001, 2002, and 2003 the option that it had under the Option Agreement as of Jan. 23, 2001, to acquire a specified portion or phase of the Taos Overlook "committed" the Trust as of that date to purchase the approximately 2,581 acres of the Taos Overlook and (2) that the Trust's "commitment then bound Klauer Manufacturing to the sale of the TVO [Taos Overlook] from the date of the signing of the Option Agreement * * * [on Jan. 23,] 2001."

[44]In fact, the Option Agreement that Klauer Manufacturing and the Trust executed on Jan. 23, 2001, provided that the Trust had (1) the option through Feb. 28, 2001, to purchase phase I for $4 million, (2) the option through Feb. 28, 2002, to purchase phase II for $5 million, and (3) the option to purchase through Feb. 28, 2003, phase III for $5.5 million.  Thus, pursuant to the Option Agreement executed on Jan. 23, 2001, if by the respective dates specified in that agreement the Trust were to have exercised its options to purchase phase I, phase II, and phase III and if Klauer Manufacturing were to have sold and the Trust were to have purchased those three phases, it would have been required to pay to Klauer Manufacturing only $14.5 million, and not $15 million.  It was only at a time not disclosed by the record after June 3, 2001, and before Feb. 15, 2002, that the Trust became aware that Klauer Manufacturing was dissatisfied with the appraised value of certain property that the Trust had acquired from the Company pursuant to the Option Agreement as amended as of that time.  In an effort to minimize the likelihood that Klauer Manufacturing would not approve the appraisal, which Klauer Manufacturing (as well as the Trust) had the right to do under par. 2 of the Second Amendment, of one or more portions of the Taos Overlook which the Company still owned and with respect

(continued...)

cord, we further find that the binding commitment test does not apply in these cases.

We turn next to the end result test.  Under that test, "purportedly separate transactions are to be amalgamated when the successive steps were designed and executed as part of a plan to achieve an intended result."  Sec. Indus. Ins. Co. v. United States, 702 F.2d at 1246; see also Penrod v. Commissioner, 88 T.C. at 1429.  The inquiry under the end result test focuses on whether the taxpayer intended to reach a particular result by structuring a series of transactions in a certain way.  See King Enters., Inc. v. United States, 189 Ct. Cl. at 475, 418 F.2d at 516.  In this regard,

> The taxpayer's subjective intent is especially relevant
> * * * because it allows us to determine whether the

---

[44](...continued)
to which the Trust were to exercise its option to acquire under the Option Agreement as amended, the Trust proposed a $500,000 increase in the aggregate amount of consideration (i.e., $14.5 million) that it would pay to Klauer Manufacturing in the event that the Trust were to decide to exercise its remaining options under that agreement.  Klauer Manufacturing agreed to that proposal, which was implemented in the Third Amendment to the Option Agreement that was effective as of Feb. 15, 2002.  It was only at the trial in these cases that the parties agreed that on Jan. 23, 2001, the date on which Klauer Manufacturing and the Trust executed the Option Agreement, the approximately 2,581 acres of the Taos Overlook had a fair market value of $15 million.  Around August 1999, when the Trust representatives first approached Klauer Manufacturing's representatives regarding the Trust's interest in the Taos Overlook, Klauer Manufacturing believed that the approximately 2,581 acres of the Taos Overlook had a fair market value of between $20 and $21 million.

taxpayer directed a series of transactions to an intended purpose. See Brown v. United States, 782 F.2d 559, 563 (6th Cir. 1986) ("[e]nd result test" for determining when to apply "step transaction doctrine" makes intent a necessary element for application of doctrine). The intent we focus on under the end result test is not whether the taxpayer intended to avoid taxes. Prior case law clearly instructs that tax reduction and avoidance motives are permissible and do not alone invalidate a transaction. * * * Instead, the end result test focuses on whether the taxpayer intended to reach a particular result by structuring a series of transactions in a certain way. * * * [Some citations omitted; fn. ref. omitted.]

True v. United States, 190 F.3d at 1175.

Respondent argues that "The evidence developed in this case [sic] easily supports a finding that Klauer Manufacturing intended to sell the 2,581 acres of the TVO [Taos Overlook] to the TPL [Trust] even though, to achieve this result, the sale was structured as a series of transactions." In support of that argument, respondent asserts:

The TVO [Taos Overlook] was a very special place for * * * [William J. Klauer] and the Klauer family. The family always felt that the TVO should be preserved. Mr. Klauer was a party to the discussions with TPL about the sale of the 2,581 acres of the TVO. He liked the proposal by the TPL and was excited about its acquisition of the TVO. Mr. Klauer, the Klauer family and, through them, Klauer Manufacturing, intended to sell the 2,581 acres of the TVO to the TPL so that it could be maintained as a very special place.

* * * Although the Option Agreement breaks the sale into three phases over three years, when TPL exercised its option to purchase and arrived at closing with the money, Klauer Manufacturing tendered a deed as it was bound to do under the agreement. As contem-

plated by the Option Agreement, the 2,581 acres of the TVO was sold by Klauer Manufacturing to TPL.

Admittedly, the Option Agreement was very much a "take it or leave it" deal offered by TPL. TPL generally controlled the shape of the agreement and was the source for use of three phases over three years due to its concerns about funding. Yet, Klauer Manufacturing did not walk away from the proposal. On January 23, 2001, James Klauer, Vice President of Klauer Manufacturing signed the Option Agreement.

Regardless, by breaking the acquisition into phases, the likelihood of its success was substantially increased. It made the project manageable by TPL's standards.

Just as Klauer Manufacturing wanted to sell the TVO when it signed the Option Agreement, Klauer Manufacturing willingly entered into four amendments of the Option Agreement to keep the sale on track and avoid any possible default by TPL. All of the amendments begin with the recitation that:

> Seller [Klauer Manufacturing] and Buyer [TPL] have previously entered into that certain Option Agreement * * * for the acquisition of 2,581 acres, more or less, of real property, located in Taos County, New Mexico, in three phases.

     *       *       *       *       *       *       *

Klauer Manufacturing was so committed to the acquisition of the 2,581 acres of the TVO by the TPL, it and the TPL did not let the Option Agreement stand in their way. According to the Option Agreement, the purchase price of Phase I was to be $4,000,000 for 860.33 acres more or less. Phase I comprised of 860.33 acres closed in March 2001 for $4,000,000 just as scheduled by the Option Agreement.

The Option Agreement provided that the sale price of the 860.33 acres comprising Phase II was to be $5,000,000. Phase II, by amendment between Klauer Manufacturing and TPL, was divided into Phase IIA, Phase

IIB and Phase IIC.  These three sub-phases of Phase II were closed by March 2002.  The total purchase price for Phase II was $8,077,000 for 1187.3 acres.

Phase III was intended to include 860.33 acres with a purchase price of $5,500,000.  The amendments by Klauer Manufacturing and the TPL divided Phase III into two sub-phases, Phase IIIA and Phase IIIB.  These sub-phases were closed by March 2003 for the purchase price of $2,923,000 for 533.3 acres.

Only Phase I closed for the acreage and at the purchase price described in the Option Agreement.  The closings of Phase II and Phase III deviated substantially from the schedule found in the Option Agreement.  Klauer Manufacturing and the TPL did not adhere to the purchase price or the acreage of Phase II and Phase III as scheduled in the Option Agreement.  Together, Klauer Manufacturing and the TPL were willing to fudge the terms of the Option Agreement, as amended, in order to complete their deal for the sale of the 2,581 acres of the TVO.

As Klauer Manufacturing wanted to sell the 2,581 acres of the TVO, the TPL wanted to purchase those 2,581 acres.  The TVO fit into the development plans of the BLM [Bureau of Land Management]. * * *

     *     *     *     *     *     *     *

There was no question that through all of these different sources [that the Trust searched for funding] and whatever entrepreneurial creative land conservation expertise TPL could apply, TPL would draw on these several sources to achieve in the end a $15 million acquisition price for all of the phases collectively.

The end result of the Option Agreement entered into between Klauer Manufacturing and the TPL in January, 2001, its objective, and its aim was the sale of the 2,581 acres of the TVO to the TPL.  For purposes of valuing the sale of the TVO and determining the bargain element of the sale, the several phases of the sale should be disregarded.  The transaction between Klauer Manufacturing and the TPL should be found to be the

sale of a single parcel of property comprised of 2,581 acres and valued as of January, 2001.

On the record before us, we reject various assertions of respondent in support of respondent's argument that the end result test is applicable in these cases. Those assertions ignore facts that we have found on the record before us, including the following facts.

When representatives of the Trust initially approached representatives of Klauer Manufacturing in August 1999 about the Trust's interest in the Taos Overlook, the Trust's representatives informed the Company's representatives that the Trust was not in a financial position to be contractually and thus legally bound to purchase all of the Taos Overlook (i.e., all of the approximately 2,581 acres of that property). That was because congressional appropriations for land acquisition projects of the Trust were uncertain, limited, and varied from year to year. There simply were no guaranties that the Trust, which had to solicit funds on an annual basis for specified possible acquisitions, would receive any congressional (or other) funding for the purchase of a portion, let alone all, of the Taos Overlook.[45] As a result, the Trust's representatives insisted that the Company

---

[45]On the record before us, we reject respondent's assertion that there was "no question" that the Trust would be able to use "different sources" in order "to achieve in the end a $15 million acquisition price for all of the phases collectively".

grant it an option to purchase annually a portion of the Taos Overlook if and when during each year the Trust had the funds to purchase such a portion. Representatives of Klauer Manufacturing insisted that any portion of the Taos Overlook with respect to which the Company were to grant the Trust an option to purchase during the initial year border an exterior boundary of the Taos Overlook. That was because Klauer Manufacturing wanted to ensure that if the Trust were to decide not to exercise its option to purchase thereafter any of the remaining specified portions of the Taos Overlook, Klauer Manufacturing, and not the Trust, would own the property in the interior of the Taos Overlook.[46]

If the Trust had been unable to obtain the funds needed to purchase a portion of the Taos Overlook specified in the Option Agreement, it would not have exercised its option under that agreement to purchase any such portion. In that event, Klauer Manufacturing would have retained the portion of the Taos Over-

---

[46]Similarly, in order to avoid having the Trust own any portion of the Taos Overlook that was located between other portions of that property that Klauer Manufacturing continued to own, par. 1 of the Second Amendment to the Option Agreement provided as follows:

The Phase II option shall be exercised upon in its entirety before any portion of the Phase III option may be exercised upon. Any portion of any Phase so exercised shall abut and share a common line with that portion of the entire property previously conveyed by the Seller [Klauer Manufacturing] to the Buyer [Trust].

look as to which the Trust did not exercise its option to pur-chase under the Option Agreement. The Option Agreement did not require the Trust to exercise any or all of its options to ac-quire the phases of the Taos Overlook specified in that agree-ment. Under the Option Agreement, the Trust's exercise of its option to acquire one phase did not obligate it to exercise its option to acquire any other phase. Klauer Manufacturing and the Trust did not have an express or implied agreement or understand-ing that the Trust would exercise all of its options under the Option Agreement. Nor did Klauer Manufacturing and the Trust have an express or implied agreement or understanding that the Trust would buy, and Klauer Manufacturing would sell, all of the Taos Overlook.

At a time not disclosed by the record before April 15, 2001, the Trust learned that the Bureau of Land Management unexpectedly had certain funds to provide to the Trust that would enable the Trust to decide whether it would be in a financial position to exercise its option to acquire and to acquire phase II of the Taos Overlook. The Trust concluded that, even with the unantici-pated funds from the Bureau of Land Management, it did not have enough money to exercise its option to acquire and to acquire phase II. However, the Trust believed that those unexpected funds would enable it to acquire approximately 218.6 acres of

that phase, provided that Klauer Manufacturing were willing to amend the Option Agreement as amended by the First Amendment in order to grant the Trust separate options to acquire at different times separate portions of phase II (and phase III) of the Taos Overlook. The Company agreed to amend that agreement and did so on April 15, 2001, when it and the Trust executed the Second Amendment to the Option Agreement. The Second Amendment provided in pertinent part:

TERMS

THE PARTIES AGREE AS FOLLOWS:

1. Paragraph 1 of the Option Agreement is amended to provide that Buyer may exercise its options as to portions of the Phase II and Phase III tracts of the Property as set forth below. Exercise of an option on a portion of a Phase shall preserve the option as to any remaining portion of that Phase within the time frame set forth in the Option Agreement for that option. The Phase II option shall be exercised upon in its entirety before any portion of the Phase III option may be exercised upon. Any portion of any Phase so exercised shall abut and share a common line with that portion of the entire Property previously conveyed by the Seller to the Buyer.

2. Paragraph 5(c) of the Option Agreement is amended to provide that an appraisal shall be performed of each and every portion of any Phase of the Property and that the appraisal, and the Closing on any such portion of any Phase, shall be subject to the review and approval of the appraisal by the Seller and the Buyer.

3. All terms of the Option Agreement necessarily modified or changed by this amendment are hereby modified and changed and all terms of the Option Agreement

not modified or amended hereby remain the same and in full force and effect between the parties.[47]

After the Trust exercised its option to acquire a portion of the property specified in the Option Agreement as amended, it continued to seek the funding that would enable it to exercise the option that it had under the Option Agreement as amended to acquire all or a portion of the next phase. Moreover, after the Trust exercised its option to acquire a portion of the property specified in the Option Agreement as amended and Klauer Manufacturing sold such portion to the Trust, Klauer Manufacturing continued to pay the real estate taxes on and the cost of maintaining the remaining acres of the Taos Overlook that the Company continued to own.

On the record before us, we find that the Trust's exercise of each of various options that it had under the Option Agreement as amended and its purchase of each of specified portions of the Taos Overlook pursuant to the exercise of each of those options

---

[47]On the record before us, we reject respondent's assertion that "Klauer Manufacturing and the TPL [Trust] were willing to fudge the terms of the Option Agreement, as amended, in order to complete their deal for the sale of the 2,581 acres of the TVO [Taos Overlook]." On that record, we find that the events that took place after Apr. 15, 2001, the date on which Klauer Manufacturing and the Trust executed the Second Amendment to the Option Agreement, are consistent with the Option Agreement as amended by that Second Amendment (quoted in pertinent part above) (and by the Third Amendment and the Fourth Amendment executed on Feb. 15, 2002, and Feb. 28, 2003, respectively).

were not component parts of a single transaction that Klauer Manufacturing intended and prearranged from the outset be taken in order to sell to the Trust the approximately 2,581 acres of the Taos Overlook.[48]  On that record, we find that the end result test does not apply in these cases.

We turn finally to the interdependence test.  That test focuses on

> whether the individual steps in a series had independent significance or whether they had meaning only as part of the larger transaction.  This test concentrates on the relationship between the steps, rather than on their "end result." * * * Thus, under this test we examine this tandem of transactional totalities to determine whether each step had a reasoned economic justification standing alone. * * * [Citation omitted.]

Sec. Indus. Ins. Co. v. United States, 702 F.2d at 1246-1247.

Respondent argues that "Klauer Manufacturing and the TPL [Trust] intended from the outset to transfer the whole of the TVO [Taos Overlook] and that the options contained in the Option Agreement were interdependent steps to reach that goal."  In support of that argument, respondent asserts:

---

[48]Respondent asserts that each of the four amendments to the Option Agreement that Klauer Manufacturing and the Trust executed recited that they executed the Option Agreement "for the acquisition of 2,581 acres, more or less, of real property, located in Taos County, New Mexico, in three phases."  Those recitations do not require us to find on the record before us that Klauer Manufacturing had a prearranged plan pursuant to which the Trust would buy, and Klauer Manufacturing would sell, the approximately 2,581 acres of the Taos Overlook.

Pursuant to the Option Agreement Klauer Manufacturing agreed to sell and convey to the TPL [Trust] and the TPL agreed to purchase and accept from Klauer Manufacturing, the TVO [Taos Overlook] in three phases. Klauer Manufacturing granted the TPL an option to purchase the TVO in the three phases. The option was exclusive to the TPL and was irrevocable by Klauer Manufacturing. * * *

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

From the point of view of Klauer Manufacturing, the steps of the Option Agreement were interdependent. The steps of the Option Agreement were so interdependent that the Option Agreement is aptly described as an agreement to sell the 2,581 acres of the TVO to the TPL with provisions for financing contingencies. So long as the TPL timely exercised its option, found the financing, and was ready and willing to close, Klauer Manufacturing was obligated to provide the necessary deeds to convey title to the property. Klauer Manufacturing then had to wait for the TPL to exercise the next option until all phases of the Option Agreement closed.

As a series of interdependent steps, the several phases for the acquisition by the TPL of the TVO from Klauer Manufacturing should be collapsed into one transaction representing the sale by Klauer Manufacturing of the 2,581 acres of the TVO on January 23, 2001, the date of signing of the Option Agreement.

On the record before us, we reject various assertions of respondent in support of respondent's argument that the interdependence test is applicable in these cases. Those assertions ignore facts that we have found on the record before us, including the following facts.

When the Trust's representatives were discussing with Klauer Manufacturing's representatives the Trust's interest in the Taos

Overlook, the Trust's representatives informed the Company's representatives that the Trust was not in a financial position to be contractually and thus legally bound to purchase all of the Taos Overlook (i.e., all of the approximately 2,581 acres of that property). That was because congressional appropriations for land acquisition projects were uncertain, limited, and varied from year to year. There simply were no guaranties that the Trust, which had to solicit funds on an annual basis for specified possible acquisitions, would receive any congressional (or other) funding for the purchase of a portion, let alone all, of the Taos Overlook. As a result, during their discussions with the Company's representatives the Trust's representatives insisted that Klauer Manufacturing grant it an option to purchase annually a portion of the Taos Overlook if and when during each year the Trust had the funds to purchase such a portion. Although Klauer Manufacturing was willing to do so, its representatives insisted that any portion of the Taos Overlook with respect to which the Company were to grant the Trust an option to purchase during the initial year border an exterior boundary of the Taos Overlook. That was because Klauer Manufacturing wanted to ensure that if the Trust were to decide not to exercise its option to purchase thereafter any of the remaining specified portions of the Taos Overlook, Klauer Manufacturing, and not the

Trust, would own the property in the interior of the Taos Over-look.[49]

The Trust presented Klauer Manufacturing with a proposed option agreement reflecting the discussions and the negotiations between the respective representatives of the Trust and the Company that had begun in August 1999. The Trust's attorney had drafted that proposed option agreement by using as a model an option agreement that the Trust typically employed when it was attempting to acquire land. The Company could have rejected the Trust's proposed option agreement. However, it decided to accept it. On January 23, 2001, Klauer Manufacturing and the Trust executed the Option Agreement that was effective as of that date.[50]

---

[49]See supra note 46.

[50]On the record before us, we reject respondent's assertion that "The steps of the Option Agreement were so interdependent that the Option Agreement is aptly described as an agreement to sell the 2,581 acres of the TVO [Taos Overlook] to the TPL [Trust] with provisions for financing contingencies." The Option Agreement contained the following pertinent "RECITALS":

RECITALS

 *     *     *     *     *     *     *

    B.  Sellers are the owners of 2,581 acres, more or less, of real property located in Taos County, New Mexico * * *

 *     *     *     *     *     *     *

(continued...)

If the Trust had been unable to obtain the funds needed to purchase a portion of the Taos Overlook specified in the Option Agreement, it would not have exercised its option under that agreement to purchase any such portion. In that event, Klauer Manufacturing would have retained the portion of Taos Overlook as to which the Trust did not exercise its option to purchase under the Option Agreement.

The Option Agreement did not require the Trust to exercise any or all of its options to acquire the phases of Taos Overlook specified in that agreement. Under that agreement, the Trust's exercise of its option to acquire one phase did not obligate it to exercise its option to acquire any other phase. Klauer Manufacturing and the Trust did not have an express or implied agreement or understanding that the Trust would exercise all of its options under the Option Agreement. Nor did Klauer Manufacturing

---

[50](...continued)

> D. It is the mutual intention of Sellers and Buyer that the Subject Property be preserved and used eventually for public, open space and habitat purposes. However this intention shall not be construed as a covenant or condition to this Agreement. Buyer makes no representation that any efforts it may undertake to secure the eventual government acquisition of the Subject Property will be successful.

On the record before us, we find that the above-quoted recitations in the Option Agreement do not require us to find, as respondent asserts, that the Option Agreement was "an agreement to sell the 2,581 acres of the TVO to the TPL with provisions for financing contingencies." See also supra note 48.

and the Trust have an express or implied agreement or understanding that the Trust would buy, and Klauer Manufacturing would sell, all of the Taos Overlook.

On the record before us, we find that the Trust's exercise of one or more but not all of the various options that it had under the Option Agreement as amended and its purchase of each of specified portions of the Taos Overlook pursuant to any such exercise would not have been fruitless without the Trust's exercise of all of those various options and its purchase of all of the specified portions of the Taos Overlook pursuant to any such exercise. On that record, we find that the interdependence test does not apply in these cases.

Based upon our examination of the entire record before us, we find that the step transaction doctrine does not apply in these cases. The parties agree that if the Court were to find, as we have, that the step transaction does not apply here, petitioners would be entitled to the charitable contribution deductions at issue.[51]

We have considered all of respondent's contentions and arguments that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

---

[51]See supra note 38.

To reflect the foregoing,

<u>Appropriate decisions will be entered.</u>[52]

---

[52]At least in certain of these cases the respective deficiencies that respondent determined are based not only on the disallowance of the charitable contribution deductions at issue that the stockholder petitioners dispute here but also on certain other determinations that petitioners in those certain cases do not dispute here.  Thus, at least in those cases computations under Rule 155 will be required.  It is not altogether clear whether computations under Rule 155 will be required in certain other cases.  Therefore, the Court will issue an Order directing the parties to inform the Court with respect to each of these cases whether computations under Rule 155 will be required.